Maco Stewart, Executor, Estate of Raymond A. Perry, Deceased, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket No. 63645.   Promulgated April 18, 1935.

*Eugene Meacham, Esq., Knox B. Phagan, C. P. A.,* and *Raymond M. White, Esq.,* for the petitioner.
*Mason B. Leming, Esq.,* for the respondent.

OPINION.

Arundell: This proceeding contests a deficiency in income tax for the year 1929 in the amount of $132,712.50. The only issue is the March 1, 1913, value of stock of the Standard Dredging Co.

In 1929 petitioner's decedent, Raymond A. Perry, sold 67,248 shares of stock of the dredging company at $29.89 per share, receiving a total of $2,010,042.72. The company was incorporated in 1905 and Perry acquired this stock prior to March 1, 1913. In determining the gain on the sale the respondent fixed the March 1, 1913, value at $4.21098 per share.

Perry was the sole owner of the stock of the dredging company, and prior to his sale of 67,248 shares in 1929, none of the stock had been sold on any exchange or otherwise. It was not listed on any stock exchange. In fixing the March 1, 1913, value of the stock the respondent determined the average capital, surplus, and earnings for the five-year period 1908 to 1912, inclusive. Computing a 10 percent return on the average capital and surplus as attributable to tangibles, he capitalized the average excess earnings at 20 percent and thus reached a value for good will of $578,450.75. Adding to this good will figure a so-called " balance sheet value " of the dredging company of $673,449.41 and a " balance sheet value " of the North American Dredging Co. of Texas of $262,162, a total value of $1,514,-062.16 was reached. The North American Co.'s stock was wholly owned by the Standard Dredging Co. Dividing the $1,514,062.16 value by 359,550-50/89, the number of shares outstanding, gave respondent a per share value of $4.21098.

In the petition filed a March 1, 1913, value of at least $19.80 per share was claimed. Petitioner in his brief claims a value of $45.04369 per share.

Petitioner's evidence was directed to showing the values of the Standard Dredging Co.'s assets at March 1, 1913. There was no evidence of any kind directly to the point of the value of the stock

itself. The assets are separated by petitioner into four groups, namely, plant and equipment, Mexican contracts, sand deposits, and good will.

The plant and equipment concerning which there is evidence consisted of mobile facilities—dredges, tugs, barges, scows, and accessories therefor. The March 1, 1913, values of these facilities were given by men who in some instances were familiar with the equipment at the basic date and in others were qualified by their experience to express values upon being furnished descriptions and photographs. Based on the testimony of the witnesses we find the March 1, 1913, value of the items comprising " plant and equipment " to be $1,500,000.

The respondent's calculation as set forth in the deficiency notice does not assign a value to plant and equipment separately from other assets. It does appear, however, that the figures used by the respondent are book values. According to information in the income tax returns placed in evidence by the respondent, plant and equipment were carried at cost. According to the returns, plant and equipment owned in 1912 cost $584,853 and that owned in 1913 cost $784,100. We do not know when the increase occurred, whether before or after March 1, 1913, and in the absence of any showing by the petitioner as to the time of acquisition or the amount allowed by the respondent for plant and equipment, we must assume that the respondent used the larger figure, $784,100. The petitioner has the burden of proving that the respondent used too low a figure, and where there is doubt as to which of two figures was used the doubt must be resolved against the petitioner. Consequently, we must assume that the respondent used the 1913 cost figure of $784,100 for plant and equipment in reaching the figure of $673,449.41 which he calls " Standard Dredging Company balance sheet value " in the computation set forth in the deficiency notice. We have found above the March 1, 1913, value of plant and equipment to be $1,500,000. It follows that the difference between $784,100 and $1,500,000, that is, $715,900, should be added to the $673,449.41 found by the respondent as "balance sheet value." This will result in an increase of the same amount, $715,900, in the total of $1,514,062.16 used by the respondent as the dividend in his calculation of the per share value.

The Mexican contracts consisted of contracts with the Government of Mexico for harbor construction and dredging at Frontera, Tampico, and Salina Cruz. The Frontera contract was entered into on November 30, 1911, between an official of the Mexican Government and the North American Dredging Co. of Texas, and provided for the performance of certain work in the port of Frontera. A part of the work was to be completed within two years from the

date of the contract. Payment was to be made as the work progressed on what may be termed a piece-work basis, that is, at certain stipulated prices per cubic meter or ton of materials dredged or construction work performed.

The Tampico contract was entered into on May 30, 1913, between the Secretary of State of Mexico and Edwin R. Davis, an employee of the Standard Dredging Co. By assignment of July 10, 1913, Davis transferred the contract to the United Dredging Co. which was a wholly owned subsidiary of the Standard Dredging Co. This contract called for the dredging of the Panuco River for a length of 13 kilometers. It was estimated that the material to be removed would amount to 10,000,000 cubic meters. The contractor was to receive an advance payment of 500,000 pesos at the time of delivery of machinery and equipment on location, and thereafter payment was to be made monthly on the basis of 56 cents per cubic meter of materials dredged, less a deduction of 12 percent until the advance payment was recovered.

The Salina Cruz contract was entered into on November 23, 1912, between an official of the Mexican Government and the North American Dredging Co. of Texas, called therein the contractor. Under it the contractor was to dredge the harbor and the entrance canal to the dike of the port of Salina Cruz. The minimum of material to be removed was 250,000 cubic meters and the maximum was 300,000 cubic meters. The contractor was to be paid " at the rate of one peso and sixty ($1.60) per cubic meter of material dredged and deposited " at specified places. The contractor was to begin work within 60 days after the date of the promulgation of the contract and complete the work within 150 days from that date. Work was started on this project in March 1913.

The contractors on the Frontera and Salina Cruz projects were hampered in their work by reason of the unsettled political situation in Mexico in 1913. On both projects some of the contractors' property was seized and its employees harassed. On the Salina Cruz project the contractor received payments in April and May aggregating $191,010.56. Other amounts owing for dredging completed were not paid and the North American Dredging Co. filed a claim therefor in the amount of $245,308.64 with the Claims Commission, United States and Mexico. In an affidavit in support of that claim Perry stated, "As a result of the losses of the claimant company at Frontera and Salina Cruz, it became and was, wholly insolvent for a number of years." A claim was also filed with the Claims Commission on behalf of the North American Dredging Co., claiming $383,526.42 for damages and losses on the Frontera project alleged to have resulted from the acts of Mexican Government troops and revolutionary forces. The Salina Cruz claim was dismissed by the Claims Com-

mission for want of jurisdiction. The disposition of the other claim is not shown.

The above mentioned contracts were the first ever obtained by any American firm for dredging in Mexican waters. Prior thereto the dredging had been done by an English concern which withdrew from the Mexican field upon entry of the American companies. When dredging contracts were entered into it was contemplated by the Mexican officials and the contractors that extensions of the operations would subsequently be performed by the same contractors. The contemplated extensions were omitted from the original contracts in order to keep the price as low as possible and thus avoid the appearance of expenditures by the Government of unduly large sums. In the case of the Standard Dredging Co. and its subsidiaries, contracts were subsequently executed for extensions and the removal of silt from channels. These companies also performed considerable work for private concerns in Mexico, consisting of dredging channels from private docks to the Government channels.

Petitioner claims a March 1, 1913, value for the Mexican contracts of $8,000,000. This is based in the testimony of Perry and the other officers of the companies as to the amount of profits they expected to realize from the original contracts plus the expected extensions. We cannot agree with the conclusion of the witnesses. The Tampico contract was not in existence on March 1, 1913. There is testimony that an oral agreement for the performance of the work had been made prior to that date and all that remained to be done at March 1 was its reduction to writing. It is hard to see wherein the company whose stock we are valuing had any property or property right at March 1 which is susceptible of valuation. It had no contract, and it is scarcely possible that the oral agreement could be assigned. All that the company had at the basic date was the possibility of securing a contract which has not been shown to be susceptible of valuation. The Frontera contract called for performance of a part of the work within two years of its date, which was November 30, 1911. In the absence of a contrary showing, we must assume a compliance with the terms. There is no showing how much the contractor was to receive for the work remaining to be done at March 1, 1913. Undoubtedly a willing buyer of the contracts, if such could be found, would have heavily discounted the prospective receipts from the Frontera and Salina Cruz contracts. It is a matter of history that as early as 1912 Mexico was beset with serious political disturbances and that condition continued throughout 1913. In February 1913 Francisco I. Madero was forced from the presidency and executed. The United States did not recognize the government organized by his successor, Victoriano Huerta, who held office until July 1914. No doubt a prospective purchaser would have taken the political sit-

uation into consideration in making any bid for the contracts. According to the claims filed with the Claims Commission, the companies here involved were adversely affected by the unsettled political conditions. The estimates of profits given by petitioner's witnesses are based on the original contracts plus the extensions. At March 1, 1913, there were no agreements for extensions sufficiently definite to be susceptible of valuation. Perry's statements to the Claims Commission indicate that the original contracts themselves resulted in losses rather than profits. Considering all the evidence, it does not convince us that the Mexican contracts had any value at March 1, 1913, substantial enough to affect the fair market value of the Standard Dredging Co. stock at that date.

At March 1, 1913, the operation of raising the grade of the city of Galveston, Texas, was under way. The city had been flooded in 1900 and thereafter sea walls had been built and the plan was to fill in sand back of the walls and raise the grade of the city. There were two deposits of sand available for this purpose. One was in Offatt's Bayou. About 1906 Perry acquired approximately 250 acres in the bayou, which acreage was so located as to prevent the dredging of sand from any other part of the deposit for use in grade raising at Galveston. This 250-acre tract was turned over to the North American Dredging Co. of Texas upon its organization and, with other land, the total being about 407 acres, was listed as having a value of $100,000 in the certificate of incorporation. The other sand deposit was on Galveston Island, east of the city of Galveston. This land, comprising some 1,500 acres, was owned by Maco Stewart, who was Perry's friend and business associate. Stewart, prior to March 1, 1913, had orally given Perry the exclusive right to remove sand from his acreage. Others attempted to secure from Stewart the privilege of dredging sand from his acreage, but he refused, saying that that had been promised to Perry. Filling operations were started by a foreign company, but it was forced to discontinue prior to March 1, 1913, because of the lack of available sand. The contract for filling was taken over by the North American Dredging Co. of Texas in 1910, under an agreement whereby the North American Co. was to receive 18½ cents per cubic yard of filling material. By reason of these deposits being privately owned they were exempt from the state tax imposed on the removal of material from public waters.

Petitioner claims a value of $5,300,000 for the sand deposits. This is based upon the dredging company's claimed ownership or control of over 1,500 acres of sand deposits containing an estimated 53,000,000 cubic yards of sand worth 10 cents per yard.

Perry's testimony, by deposition, was that he or his companies owned 1,570 acres of sand deposit in Offatt's Bayou. This was dis-

proved, Stewart's testimony being that there was not that much land in the bayou, and it was developed that the total amount owned by Perry or his companies in the bayou was 250 acres. The claim now is that by reason of Perry's exclusive right to dredge from Stewart's property the value of the sand deposit on the property should be treated as an asset of the Standard Dredging Co. There are several manifest weaknesses in petitioner's claim to a value of $5,300,000. The testimony of two other witnesses on this subject, like that of Perry's, was based on ownership of some 1,500 acres of sand deposit in Offatt's Bayou. Perry's conclusion of value was based in part on the notion that the dredging company received "from 30 to 31 cents per cubic yard, sometimes more" for the fill at Galveston. The parties subsequently stipulated that under the contract of 1910 the company received 18½ cents per yard. Perry also testified that the net profits from filling operations in the vicinity of Galveston down to 1928 were $1,895,952.61. There is no segregation of this into amounts realized before and after March 1, 1913, so we have no way of knowing whether the anticipated profits at March 1, 1913, have been realized. There is evidence that the dredging of sand from Offatt's Bayou was started in 1906, and it is entirely possible that a substantial part of the profits were made between then and 1913.

It is obvious that the 1,500 or more acres of land owned by Stewart can not be treated as dredging company land merely because of oral permission given to Perry to remove sand. This was a privilege that, as far as the record shows, Stewart could have terminated at any time. But even assuming an indefeasible right in the dredging company to remove sand, there is no showing of how much sand would be needed to complete the Galveston filling operations, nor is there any showing that the sand was of any value for any other purpose. For all we know, it is quite possible that only a fraction of the sand deposits would be necessary after March 1, 1913, in the filling operations then in view.

Considering all the evidence, we are not convinced that the dredging company's sand deposits and its right to dredge from Stewart's land had a value at March 1, 1913, in excess of $100,000. According to counsel for the respondent, in stating the issues, and not questioned by counsel for petitioner, the amount of $100,000 has been included by the respondent in tangible assets for the purpose of figuring the value of the stock.

Good will is claimed to have had a value of $1,500,000. The testimony of the witnesses ranged all the way from $1,000,000 to $5,000,000 for the value of good will. Upon analysis, the testimony does not support the conclusions expressed. The only witness who explained his method of computation appears to have had in mind

the value of all properties, tangible and intangible. The respondent in determining the value of the stock included good will as an element in the amount of $578,450.75. The evidence is not convincing that good will had any greater value.

The items which we have so far considered, being those to which the evidence was directed, are only some of the elements which, in the absence of sales of stock, usually go into a determination of stock value. The other elements are entirely missing except as some few are shown in the computation upon which the Commissioner based his determination. Net income is not shown except as it appears in returns placed in evidence by the respondent. These returns for the five calendar years 1909 to 1913, inclusive, show an average annual net income of a little over $49,000. The Commissioner used $142,-454.40 as "average total earnings" for the five years 1908 to 1912 in figuring good will. There is no evidence of either total assets or liabilities, consequently we do not know the amount of surplus except as shown by the respondent's computation. This computation shows a deficit for each of the years 1908 and 1909, a surplus of $15,206.94 for 1910, $513,447.61 for 1911, and $576,135.99 for 1912; an average of $217,642 for the five-year period. We have indicated above that the evidence does not establish the value of the sand deposits as being greater than allowed by the respondent. We have also set forth our conclusion as to the value of the plant and equipment. Ordinarily proof of value of a particular asset, or even proof of value of all assets, without more, is insufficient to establish the market value of stock. But in this case it is shown that the respondent has based his computation of stock value on asset values, and neither party now questions that method. The petitioner's evidence is directed entirely toward showing a higher value for the corporate assets, and the respondent's is directed toward sustaining the valuation he has used. In this situation, where the taxpayer establishes an asset value higher than that used by the respondent, we feel warranted in holding that the increase shown should be added to the amount used by the respondent. In this case the increase, as set out above, is $715,900 applicable to plant and equipment. The evidence as to the other items being insufficient to convince us of error in the respondent's determination, the other items will remain unchanged. Adding the increase of $715,900 to the value of $1,514,-062.16 used by respondent as net asset value, and dividing the sum by the number of shares of stock outstanding, gives a per share value of $6.20207. This figure should be used as the basis to determine gain on the sale of stock instead of the figure of $4.21098 used by the respondent.

*Decision will be entered under Rule 50.*